UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JUWAN ALLEN, as Personal Representative of the Estate of CHAYCE ALLEN, Deceased,** | **2:25-CV-10915-TGB-KGA** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **RANDALL T. FIELDS DAVIS, APRIL L. SHAKOOR, TRACIE FIELDS, DOMINIC FOX, JASMINE GATLING, TRESA SIMMONS, ALYSON DORSEY, LASHAWNDA, MCCOY, LARRY CHRIST, STEVEN M. BROTT, JOSHELLE SHELBY, and KEJUANA MCCANTS, individually and in their official capacities as employees of State of Michigan, Department of Health and Human Services, Children's Protective Services Division,** | **ORDER GRANTING STATE DEFENDANTS' MOTION TO DISMISS** **(ECF NO. 33)** |
| Defendants. | |

This is a heartbreaking case arising out of the tragic death of three-year-old Chayce Allen following years of alleged abuse and neglect by his mother. Chayce's father, Juwan Allen, brings this lawsuit as personal representative of the Estate of Chayce Allen against a number of Defendants who he asserts are all current or former Child Protective Services ("CPS") employees of the Michigan Department of Health and

1

Human Services ("MDHSS"). He alleges that the Defendants failed to act with reasonable care and diligence with respect to their investigations into allegations of abuse and neglect of Chayce by his mother and that Defendants could have prevented Chayce's death at the hands of his mother.

Now before the Court is the State Defendants' Motion to Dismiss, seeking dismissal of all of Plaintiff's claims against them. ECF No. 33. The motion has been fully briefed. ECF Nos. 36, 41. A hearing on Defendants' motion was held on March 12, 2026, at which counsel for the parties appeared and argued. For the reasons stated below, Defendants' Motion to Dismiss will be **GRANTED**.

## I.   BACKGROUND

### A. Factual Background

According to Plaintiff's First Amended Complaint, on June 24, 2022, police found three-year-old Chayce Allen's body stuffed into a broken freezer in the basement of his mother's home. First Amended Complaint ("FAC") ¶¶ 1–2, ECF No. 17.[1] Plaintiff alleges that the autopsy report revealed evidence of blunt force trauma to Chayce's head,

---

[1]    The Court notes that in the parties' briefing to the Court, both Plaintiff and Defendants refer to the original Complaint filed in this case at ECF No. 1. *See* ECF Nos. 33, 36, 41. However, the operative pleading in this case at the time Defendants' motion to dismiss was filed is the Plaintiffs' First Amended Complaint at ECF No. 17. The Court will refer to that pleading in this Order.

and various other healed injuries including a femur fracture, skull fracture, and a nondisplaced rib fracture. *Id.* ¶ 4. As discussed next, prior to that tragic discovery, Child Protective Services ("CPS") employees at the Michigan Department of Health and Human Services ("MDHSS") had conducted a number of home visits and initiated several investigation reports of physical abuse and neglect of Chayce by his mother, Azuradee France, dating back to when Chayce was just months old. *Id.* ¶¶ 5–6.

Chayce Allen was born on September 1, 2018. *Id.* ¶ 29. He lived with his mother, France, and her four other biological children at a house on Monte Vista Street in Detroit. *Id.* ¶ 30.

On November 17, 2018, when Chayce was just over two-months old, Defendant Tresa Simmons, then a CPS Specialist, filed a CPS Investigation Report, noting allegations of physical abuse and neglect by France against her nephew and her own children, including Chayce. *Id.* ¶¶ 39–42. According to the allegations in the Report, France had been watching her two-year-old nephew Logan for two months. *Id.* ¶ 41; MDHHS CPS Records for Chayce Allen, ECF No. 36, PageID.324. When Logan's mother tried to pick him up, France would not let her. ECF No. 36, PageID.324. The police intervened and found that Logan had been seriously injured by France. He had a black eye and multiple bruises on his buttocks, penis area, behind his neck, and on the top of his head. FAC ¶ 41, ECF No. 17; ECF No. 36, PageID.324. Logan was also

malnourished, dirty, and smelled of urine. FAC ¶ 41, ECF No. 17; ECF No. 36, PageID.324. France admitted to "whupping" Logan with a belt multiple times, and that she used the same form of discipline on her own children. FAC ¶ 42, ECF No. 17; ECF No. 36, PageID.324–25. France was arrested and charged with Child Abuse 3. FAC ¶ 41 fn.2, ECF No. 17.

Plaintiff alleges that during a subsequent home visit, CPS observed that the children did not have beds, that France's home was rat infested, with rats having chewed holes through the childrens' pack n play, and that one of France's kindergarten-aged daughters was not going to school. FAC ¶¶ 43–44, ECF No. 17. Defendant Simmons filed a petition for removal of France's children, including Chayce, and termination of France's parental rights. The Wayne County Third Circuit Court, Family Division granted the petition for removal of France's children on December 6, 2018, but did not terminate her parental rights. The children were removed by the court that day, and France was placed on Michigan's Child Abuse and Neglect Central Registry.[2] *Id.* ¶¶ 46–47; ECF No. 36, PageID.219, 331. Chayce was initially placed with his

---

[2]     The "Central registry" is a "repository of names of individuals who are identified as perpetrators related to a central registry case in the department's statewide electronic case management system," and "'Central registry case' means the department confirmed that a person responsible for the child's health or welfare committed serious abuse or neglect, sexual abuse, or sexual exploitation of a child, or allowed a child to be exposed to or have contact with methamphetamine production." M.C.L. §§ 722.622(c), (d).

maternal uncle until January 11, 2019, when he was placed with a licensed foster parent. ECF No. 36, PageID.219. The court returned France's children, including Chayce, to her on November 17, 2020. *Id.* ("Court wardship was dismissed on 11/17/2020."); FAC ¶ 48, ECF No. 17.

Less than two months after the children were returned to France, on January 8, 2021, CPS investigated an abuse allegation involving medical neglect of Chayce. FAC ¶¶ 49–52; ECF No. 36, PageID.269–70. It was alleged that Chayce was observed to have 2nd and 3rd degree burns on his hand from a bowl of hot noodles, that the burns had progressed to the point of the top layer of skin peeling, and that France had failed to take Chayce to the doctor to have the injury properly treated. FAC ¶ 50, ECF No. 17; ECF No. 36, PageID.270. Defendant Randall Fields Davis, CPS Investigator, conducted a home visit to France's home on January 11, 2021, where he observed Chayce's burn, and also noted that four children were sharing one bunkbed, the home was cluttered and considered a fire hazard, and there was a bottle of bleach without a lid sitting on the floor. FAC ¶¶ 51–52, ECF No. 17; ECF No. 36, PageID.275–76. While France told Fields Davis during the home visit that she had taken Chayce to the urgent care for his burns, after the home visit, France called Fields Davis and admitted that she had lied about that because she did not want her children taken away from her. FAC ¶¶ 54–55, ECF No. 17; ECF No. 36, PageID.276. France's aunt instead had provided care, and France did not take Chayce to the hospital

for treatment until after CPS became involved. FAC ¶¶ 54–56, ECF No. 17. Once at the hospital, Plaintiff alleges, the doctors treated Chayce's burn and also discovered an abscess on his ankle that required immediate surgery and a multiple-day hospitalization. *Id.* ¶¶ 55–56.

Plaintiff alleges in his Response brief (but not in his FAC), that on or about January 20, 2021, Defendant Alyson Dorsey reported that she "had no concerns when Chayce [redaction] were returned to [France]" in November 2020, and that she believed the burn on Chayce's hand was an accident. ECF No. 36, PageID.184 (citing *id.* PageID.279). Chayce remained in France's care and CPS continued to monitor France through periodic progress reports until around April 2021. *Id.* ¶¶ 57–58.

On September 1, 2021, Plaintiff alleges that France admitted to physically abusing Chayce by spanking him excessively about a week prior. *Id.* ¶¶ 60–61. The CPS Investigation Report states that a complaint was made that, "[a] little over a week ago," France had called a relative to come pick Chayce up, and that he was observed with a black eye, a gash near the top of his eyebrow, and bruised ribs, and he appeared malnourished and was vomiting after eating. *Id.* ¶¶ 61–62; ECF No. 36, PageID.307. The Report does not state who made the complaint to CPS, although France suspected that it might have been made by her mom or her sister. ECF No. 36, PageID.310.

On September 2, 2021, Defendant Dominic Fox, then a CPS Specialist, interviewed France at a hotel where she was staying with four

6

of her children, but not Chayce. FAC ¶ 63, ECF No. 17; ECF No. 36, PageID.310. France reported that Chayce was staying at her father's house in Coldwater, Michigan. She denied the abuse allegations in the complaint. FAC ¶ 64, ECF No. 17; ECF No. 36, PageID.310.

Plaintiff alleges that Defendant Steven Brott, CPS Specialist, went to France's father's house in Coldwater on September 2, 2021, interviewed him, and verified that Chayce was staying there. FAC ¶¶ 65–66; ECF No. 36, PageID.311. Brott observed Chayce and noted that he appeared to be clean and appropriately dressed, and that he did not present with a black eye or swollen forehead cuts near his eyebrow, but did have old marks and skin discoloration on his chest. ECF No. 36, PageID.311. It was agreed by the parties that Chayce would stay in Coldwater with his grandfather for "an extended amount of time." *Id.* Brott advised France's father that Chayce would need to be seen by a doctor to prove his physical wellbeing. *Id.* Chayce was examined at Promedica Coldwater Regional Hospital that same day, and the examination revealed "no serious concerns," that Chayce's head "appeared to be fine," and no injuries to his body were seen (other than "some old marks and scars"). *Id.* PageID.313. Chayce was "on the small side for his age but not to the point of malnourishment." *Id.*

Medical exams were also conducted on France's other children, and all "appear[ed] to be normal, well-fed and without any marks/bruises on their bodies." *Id.* CPS conducted home visits at France's home on

September 8, 2021, and September 15, 2021, and noted that Chayce had been returned home from his grandfather's house by the visit on the 15th. *Id.* PageID.313–14. At that time, Chayce did not have any marks or bruises on his body and there were no marks or scars on his face. *Id.* PageID.314. France advised that she had made an optometrist appointment for Chayce at the Kresge Eye Institute on October 8, 2021 "to get his rapid eye movement further observed." *Id.* Following more "successful" case contacts with France, the CPS Report concluded that "Chayce did not suffer any injuries from the alleged incident per his physical abuse exam results," and "[t]here is not a preponderance of evidence to support the allegations of his complaint" as "[t]here is no evidence of child abuse or neglect" and "Chayce did not suffer any medical or mental injuries as a result of these allegations." *Id.* PageID.314–16. The investigation was closed on October 14, 2021, with the investigator finding no evidence of child abuse or neglect. *Id.* PageID.315–16.

Plaintiff, however, alleges that Chayce presented to a hospital on October 9, 2021 to evaluate for claims of head trauma and blindness, and that the medical records indicated full blindness as a result of blunt force trauma to the head, and also a nondisplaced fracture of Chayce's left femur. FAC ¶¶ 67–69, ECF No. 17; ECF No. 36, PageID.259. Plaintiff alleges that Chayce was discharged from the hospital on October 13, 2021. FAC ¶ 72, ECF No. 17; ECF No. 36, PageID.259. The only record in the CPS Report with regard to these allegations is in the medical

examiner's report following Chayce's death. ECF No. 36, PageID.259. The medical examiner noted that Chayce presented to the hospital on October 9, 2021 with complaints of blindness and that he had a normal ophthalmologic exam and no ocular cause for visual impairment was found. A head CT scan showed right and left sided subdural fluid in his skull, and there was scalp edema in the right frontal region. A brain MRI showed bilateral subdural hematomas and Chayce was admitted to the hospital where a skeletal survey showed a healing injury of the left femur. Chayce was discharged on October 13, 2021. *Id.*

Approximately eight months later, on June 23, 2022, CPS received a complaint that Chayce had not been seen at his home for "the better portion of the past year," and that France had told various stories about where he was, including that she dropped him off at a hospital and gave him up, and there was a concern that Chayce may not still be alive. FAC ¶ 31, ECF No. 17; ECF No. 36, PageID.217–18.

The Detroit Police Department conducted a welfare check the next day. FAC ¶ 31, ECF No. 17; ECF No. 36, PageID.220. France first told the responding officer that she gave Chayce to a "Mrs. Robertson," but that she did not have a first name, phone number, nor address for that person. ECF No. 36, PageID.220. France then eventually confessed that Chayce was in the basement deceased. The officers found Chayce's body in a freezer in the basement of the home and arrested France. FAC ¶¶ 32–34; ECF No. 36, PageID.220–21. France reported that Chayce's

9

body has been in the freezer since March or April 2022. FAC ¶ 33, ECF No. 17; ECF No. 36, PageID.224.

On July 29, 2024, France pled guilty to Second Degree Murder and she was sentenced to 35 to 60 years imprisonment in the Michigan Department of Corrections ("MDOC"). https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=537743 [https://perma.cc/8PQR-P7X2].

## B. Procedural History

Juwan Allen, Chayce's father, as Personal Representative of the Estate of Chayce Allen, brings this lawsuit against eleven State Defendants, all current or former employees of the MDHSS.[3] Plaintiff alleges claims against all Defendants for: (1) Count I – Violation of 42 U.S.C. § 1983 pursuant to the Fourth and Fourteenth Amendments

---

[3]     Plaintiff also brings this lawsuit against one other Defendant, Alyson Dorsey. Defendants assert that Ms. Dorsey is not an MDHHS/CPS employee and she is not represented by the Michigan Department of Attorney General. ECF No. 33, PageID.144 fn.1. It appears from the CPS Investigation records that Dorsey may be a social worker who was assigned to France's case at one time. ECF No. 36, PageID.279.

The Court notes that Plaintiffs' motion for alternate service on Dorsey was granted on July 29, 2025, ECF No. 38, and Plaintiff filed certificates of service on Dorsey pursuant to that order. However, as of this date, Dorsey has not appeared or responded to the FAC. In addition, Plaintiff had originally named one additional defendant—Candace Anderson—but she was dismissed when Plaintiff filed his First Amended Complaint and did not name her as a Defendant. *See* FAC, ECF No. 17. The State Defendants assert that Anderson also was not an MDHHS/CPS employee. ECF No. 33, PageID.144 fn.1.

based on a duty to protect Chayce from harm and abuse; (2) Count II – Violation of 42 U.S.C. § 1983 pursuant to Fourteenth Amendment Due Process claim for State Created Danger; (3) Count III – State law gross negligence in violation of M.C.L. § 691.1407; and (4) Count IV – State law wrongful death under M.C.L. § 600.2922. FAC, ECF No. 17. Plaintiff seeks compensatory and punitive damages, as well as costs, attorney's fees, and prejudgment interest. *Id.*

The State Defendants—Randall Fields Davis (CPS Investigator), April Shakoor (CPS Investigator), Tracie Fields (former CPS Investigator), Dominic Fox (former CPS Specialist), Jasmine Gatling (former CPS Specialist), Tresa Simmons (former CPS Specialist), LaShawnda McCoy (CPS Specialist), Larry Christ (retired CPS Specialist), Stephen Brott (CPS Specialist), Joshelle Shelby (CPS Specialist), and Kejuana McCants (CPS Specialist)—have now filed the instant Motion to Dismiss, seeking dismissal of all of Plaintiff's claims against them. ECF No. 33. Plaintiff has filed a Response in opposition, attaching a copy of Chayce's CPS Investigative Report as an exhibit, ECF No. 36, and the State Defendants filed a reply brief in support of their motion. ECF No. 41.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. To state a claim, a complaint must provide a "short and plain

11

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) ("To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is the defendant who "has

12

the burden of showing that the plaintiff has failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829–30 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.... [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."). The MDHHS CPS File for Chayce Allen, attached as an Exhibit to Plaintiff's Response brief, are documents "referenced in the plaintiff's complaint and that are central to plaintiff's claims," and may be considered in ruling on Defendants' motion to dismiss.

## III.   DISCUSSION

### A. Plaintiff's 42 U.S.C. § 1983 Claims (Counts I and II)

Section 1983 provides a federal cause of action against anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The threshold requirement for a § 1983 claim is that the plaintiff must have been deprived of some right that originates in federal statutory or constitutional law. *Lewellen v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 34 F.3d 345, 347 (6th Cir. 1994).

Plaintiff asserts two claims against all Defendants for deprivation of Chayce's civil rights under 42 U.S.C. § 1983. In Count I, Plaintiff alleges due process violations under the Fourth and Fourteenth Amendments based upon Defendants' alleged failure to act with reasonable care and diligence to protect Chayce from harm and abuse, and failure to intervene to prevent further abuse. FAC ¶¶ 79–83 (Count I) ECF No. 17. He alleges that Defendants "substantially deprived" Chayce of his "right to be free from cruel and unusual punishment, including death by abuse and neglect," "right to due process under the law, including the right to be protected from known threats to safety and well-being," and "right to be free from governmental indifference to harm or abuse that shocks the conscience of a civilized society." *Id.* ¶ 82.

14

Plaintiff alleges in Count II of his FAC a Fourteenth Amendment due process claim based upon a state-created danger theory. *Id.* ¶¶ 84–85 (Count II).[4] He asserts that Chayce had a right not to be deprived of life without due process and that Defendants violated this right through creation of a state-created danger when they undertook certain "affirmative acts," including how they investigated the abuse allegations involving Chayce, when they returned him to France, and that they declined to file mandatory reports. *Id.*

However, in his Response to the Defendants' motion to dismiss, Plaintiff asserts that both § 1983 counts are premised on the state-created danger theory. *See* ECF No. 36, PageID.198–200 (stating he has "adequately alleged a substantive due process violation under the state-created danger doctrine" in Count I, and that Count II "pertain[s] to Defendants' state-created danger."). He asserts under both Counts that "Defendants created the danger that took Chayce's life by removing Chayce and then repeatedly returning him to France despite escalating evidence of abuse." *See id.* Similarly, at the hearing, Plaintiff argued that Defendants were liable under the state-created danger theory.

---

[4]   The Court notes that after paragraph 89 in the FAC, the paragraphs re-number starting at 80, so Count II actually has 12 paragraphs in total, not one.

### 1. Official Capacity Claims

In his First Amended Complaint, Plaintiff asserts claims against all Defendants "individually, and in their official capacities as employees of the State of Michigan, Department of Health and Human Services, Children's Protective Services Division." FAC Caption and ¶ 21, ECF No. 17. The State Defendants' first argument is that because Plaintiff seeks only money damages against them, his claims against them in their official capacities are barred by Eleventh Amendment immunity. ECF No. 33, PageID.148–49.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Thus it is well-settled law that a state generally may not be sued for money damages in federal court by a private individual. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Ernst v. Rising*, 427 F.3d 351, 358–59 (6th Cir. 2005). State agencies and those agencies' officials sued in their official capacities enjoy this same immunity. *Ernst*, 427 F.3d at 358. This is because the individuals are working on behalf of the state, and so a complaint against an individual in his or her official capacity "is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

16

In his Response, Plaintiff asserts Eleventh Amendment immunity is not applicable because he "brings claims only against Defendants in their *individual* **capacities**." ECF No. 36, PageID.186–87 (emphasis in original) (referring to a "captioning error" in his Complaint). He "stipulates to the dismissal without prejudice of official capacity claims and seeks leave to amend the Complaint … to that effect." *Id.* PageID.187.

The Court finds that Plaintiff's claims under 42 U.S.C. § 1983 against the State Defendants in this case in their official capacities for money damages are no different from a suit against the state itself, which would be barred by sovereign immunity. Accordingly, based on Eleventh Amendment sovereign immunity, and Plaintiff's stipulation, the Court will **DISMISS WITH PREJUDICE** all § 1983 claims against the State Defendants in their official capacities for lack of subject matter jurisdiction.

### 2. Lack of Factual Allegations or Personal Involvement of Defendants Gatling, Christ, Shelby, McCoy, McCants, Shakoor, and Fields

Plaintiff asserts that the State Defendants, in their individual capacities, violated Chayce's constitutional rights. The State Defendants argue that while Plaintiff purports to assert § 1983 claims against all of them in their individual capacities, the only State Defendants mentioned

by name in the body of the FAC in relation to any alleged acts are Defendants Simmons, Fields Davis, Fox, and Brott.

Specifically, Plaintiff alleges that Defendant Simmons filed a CPS Investigation Report regarding the allegations of France's abuse of her nephew in November 2018 when Chayce was two months old, and that Simmons filed a petition for the removal of France's children, including Chayce, with the state court on December 6, 2018. FAC ¶¶ 39–42, 46, ECF No. 17. Plaintiff alleges that Fields Davis, Fox, and Brott conducted home visits and interviews related to subsequent CPS investigations involving Chayce that appear to have resulted in determinations that abuse did not occur. *See id.* ¶¶ 51–54 (alleging that Fields-Davis observed burns on Chayce's hand when he conducted a home visit in January 2021 and that France admitted that she had initially lied about taking Chayce to urgent care because she "did not want her children taken away from her"), 63 (alleging Fox interviewed France at a hotel in September 2021 where she was staying with her children, except for Chayce, who was not there, and that the report noted the hotel was "not adequate or safe" housing for all of her children), and 65–66 (alleging Brott visited France's father's house in September 2021, verified Chayce was staying there, and interviewed both Chayce and his grandfather). Plaintiff otherwise only makes allegations of conduct by "Defendants" as a group, without differentiating as to any specific State Defendant. *See* FAC generally.

18

Federal notice pleading requires, at a minimum, that the complaint advise each defendant of what he allegedly did or did not do that forms the basis of the plaintiff's claims against him. *Iqbal*, 556 U.S. at 678. With the exception of Defendants Simmons, Fields Davis, Fox, and Brott, none of the other named defendants are identified in the FAC as having done anything or taken any action. Making a collective reference to "the Defendants"—when there are 12 defendants listed in the caption of the FAC—fails to satisfy basic pleading requirements and fails to place any particular defendant on notice that Plaintiff sought to hold him or her responsible for the allegations made in the FAC. *See Mann v. Mohr*, 802 F. App'x 871, 876 (6th Cir. 2020) (district court properly dismissed defendants not specifically named in the complaint); *Jones v. Campbell*, No. 24-10683, 2024 WL 3262606, at *3 (E.D. Mich. July 1, 2024) (Michelson, J.) ("[W]hen a person is named as a defendant without an allegation of specific misconduct, the complaint is subject to dismissal, even under the liberal construction afforded to pro se complaints.").

Moreover, Plaintiff brings his claims against these Defendants under 42 U.S.C. § 1983, which requires allegations of personal involvement. "When suing an individual actor ... for constitutional violations under § 1983, a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Flagg v. City of Detroit*, 715

F.3d 165, 174 (6th Cir. 2013). "[I]t is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what to whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Jack-Bey v. Michigan Dep't of Corr.*, No. 1:13CV131, 2014 WL 1255910, at *5 (W.D. Mich. Mar. 26, 2014) (emphases added) (*quoting Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis omitted)). "Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983." *Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004); *see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 564 (6th Cir. 2011) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right … We must analyze separately whether [plaintiff] has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant.") (emphasis in original).

Accordingly, Plaintiff's failure to plead what Defendants Gatling, Christ, Shelby, McCoy, McCants, Shakoor, or Fields are alleged to have done, or not done, to specifically participate in the alleged violation of

20

Chayce's constitutional rights does not give those Defendants sufficient "notice of his [or her] alleged wrongdoing," *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002), and Plaintiff therefore fails to state a claim against those seven State Defendants for violation of a constitutional right under 42 U.S.C. § 1983.

Plaintiff does not dispute that he fails to include any allegations as to Defendants Gatling, Christ, Shelby, McCoy, McCants, Shakoor, or Fields in his FAC, and he did not move before the hearing to amend the complaint to add any such allegations (although Plaintiff's counsel did state at the hearing that the Complaint may have been "overinclusive" and that he would like permission to amend the complaint to limit the named Defendants). *See* ECF No. 36, PageID.193–94. He instead contends that "discovery is still ongoing, and this will be specifically parsed out during discovery." *Id.* He argues that a court must afford adequate time for discovery "'[b]efore ruling on **summary judgment motions**.'" *Id.* (emphasis in original).

However, this case is not at the summary judgment stage of proceedings, but at the motion to dismiss stage. "Defendants have the right to test the sufficiency of Plaintiff's pleadings before being required to participate in discovery." *Haltom v. City of Henderson, Tenn. Police Dep't*, No. 1:24-CV-01215-STA-JAY, 2025 WL 2058779, at *9 (W.D. Tenn. July 23, 2025). "[F]ederal courts will not 'unlock the doors of discovery' for a fishing expedition based on a plaintiff's speculative assertions."

*Changizi v. Dep't of Health & Human Servs.*, 82 F.4th 492, 498 (6th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678–79). And "[u]nfortunately for Plaintiff[], discovery cannot be used as a fishing expedition to uncover the facts necessary to support the causes of action presented in the complaint, 'even when the information needed to establish a claim…is solely within the purview of the defendant or a third party.'" *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1001 (S.D. Ohio 2016) (quoting *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1051 (6th Cir.2011)); *see also Christian v. Mich. Dep't of Corr.-Health Servs.*, No. 12-CV-12936, 2014 WL 1118443, at *13 (E.D. Mich. Mar. 20, 2014) (Murphy, J.) ("Christian cannot maintain an action against Van Ausdale on the mere possibility that discovery will uncover her involvement in constitutional violations."); *Cathcart v. Scott*, No. 2:13-CV-502, 2013 WL 4784348, at *3 (S.D. Ohio Sept. 6, 2013) ("Lacking allegations giving rise to a colorable claim against defendant Scott, the *Complaint* cannot be salvaged by the mere hope that, through discovery, such facts will emerge.").

Further, Plaintiff's contention in the Response that he has pleaded that the Defendants maintained policies and practices that prioritized family reunification over child safety and that the "systemic nature of CPS operations" means that all State Defendants contributed to the alleged constitutional violations fails to save Plaintiff's claims against Defendants Gatling, Christ, Shelby, McCoy, McCants, Shakoor, and

Fields. Plaintiff expressly asserts that he is not bringing claims against the Defendants in their official capacities, and he does not assert a *Monell*[5] claim against CPS. Accordingly, as discussed above, each Defendants' liability "must be assessed individually based on his [or her]own actions," *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), and "Section 1983 liability … cannot be premised solely on a theory of respondeat superior, or the right to control employees." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* Plaintiff's attempt to hold the individual State Defendants liable in their individual capacities for adherence to or continuation of "policies and practices" and the "systematic nature of CPS operations" "improperly conflates a § 1983 claim of individual or supervisory liability with one of municipal liability." *Id.* at 647–48; *see also Miller v. Calhoun Cnty.,* 408 F.3d 803, 817 n. 3 (6th Cir. 2005) (indicating that where there is an absence of evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed to be brought against them in their official capacities and are treated as claims against the county)).

---

[5]    *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

23

Accordingly, Plaintiff's claims against Defendants Gatling, Christ, Shelby, McCoy, McCants, Shakoor, and Fields will be **DISMISSED** for failure to state a claim.

### 3. Absolute Immunity

The State Defendants argue that Simmons, Fields Davis, Fox, and Brott have absolute immunity from Plaintiff's individual capacity claims against them, which are predicated on actions taken in their roles as legal advocates when conducting their investigations. ECF No. 33, PageID.149–51. The State Defendants further contend that the other seven State Defendants similarly have absolute immunity to the extent any of the claims are related to the filing of petitions in circuit court, the adequacy of the investigations that led to a court recommendation, and the validity of a court filing. *Id.*

Plaintiff argues in Response that absolute immunity does not apply to the State Defendants' conduct alleged in the Complaint because his claims are not based on the filing of petitions or court testimony, but on failing to adequately investigate obvious signs of abuse, returning a child to a dangerous environment, closing investigations without proper safeguards, and acting with deliberate indifference to escalating danger. ECF No. 36, PageID.187–89. However, at the hearing, Plaintiffs' counsel conceded that certain Defendants' actions undertaken in connection with seeking court orders to remove France's children would be entitled to absolute immunity.

24

The Sixth Circuit has held that social workers are absolutely immune only when, like prosecutors, they act in their capacity as "legal advocates" in initiating and pursuing child dependency hearings and testifying under oath. *Kovacic v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (citing *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011)). However, social workers are not entitled absolute immunity when "they are performing administrative, investigative, or other functions." *Id.* The Sixth Circuit has been clear: "absolute immunity based on a prosecutorial function covers interactions with a court, such as testimony or recommendations given in court concerning the child's best interests as [the defendant] saw the matter," or preparing an order for entry by the court. *Id.* (citation modified); *see also Rippey ex rel. Rippy v. Hattaway*, 270 F.3d 416, 422–23 (6th Cir. 2001) (social worker absolute immunity also includes acting in an advisory role–such as preparing and giving reports to the juvenile court in recommending whether a child is ready to return home from state custody—because "[i]n performing that role, social workers … act in much the same fashion as probation officers who make sentencing recommendations to criminal courts for which they are entitled to absolute immunity") (citations omitted). Thus, under the Sixth Circuit's "functional" analysis, whether a social worker is entitled to absolute immunity depends on whether her complained-of actions

25

were taken in her capacity as a "legal advocate." *See Pittman*, 640 F.3d at 724.

As discussed above, Plaintiff alleges that Defendants Fields Davis, Fox, and Brott conducted home visits and interviews related to subsequent CPS investigations that appear not to have resulted in determinations that abuse occurred. *See* FAC ¶¶ 51–54, 63, 65–66. These alleged actions do not appear to be taken in those Defendants' capacity as "legal advocates," but instead appear to be non-advocacy legal functions, such as administrative, investigative, or other tasks. Accordingly, Defendants Fields Davis, Fox, and Brott are not entitled to absolute immunity for the allegations against them in Plaintiff's FAC.

Plaintiff alleges that Defendant Simmons filed a CPS Investigation Report in or around November 2018 noting allegations of physical abuse and neglect by France against her nephew and neglect of France's children. FAC ¶¶ 40–42, ECF No. 17. As with Defendants Fields Davis, Fox, and Brott above, these alleged actions do not appear to be taken in Simmons's capacity as a legal advocate, and thus she is not entitled to absolute immunity for those acts. However, Plaintiff also pleads that Simmons filed a petition for removal of France's children on December 6, 2018, and that Chayce and his siblings were removed by the Wayne County Third Circuit Court, Family Division that same day. *Id.* ¶¶ 46–47. Filing a petition with the court for removal of the children is precisely the type of conduct that falls under the umbrella of legal advocacy as

defined by the Sixth Circuit. *See Kovacic*, 724 F.3d at 694 (extending absolute immunity to social workers' "prosecutorial functions" such as 'testimony or recommendations given in court concerning the child's best interests'") (citing *Pittman*, 640 F.3d at 725). As stated above, Plaintiff's counsel conceded this at the hearing.

Accordingly, the Court finds that Defendant Simmons is entitled to absolute immunity against Plaintiff's § 1983 claims for filing the removal petition with the state court.

### 4. Qualified Immunity

The State Defendants next argue that they have qualified immunity from Plaintiff's § 1983 claims against them. ECF No. 33, PageID.152–55. The doctrine of qualified immunity shields government officials from liability "insofar as their conduct does not violate clearly established … constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether a government official is entitled to qualified immunity involves two inquiries: (1) whether the facts, viewed most favorably to the plaintiff, show a constitutional violation, and (2) whether the right was "clearly established" when the misconduct occurred. *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011). The court has the discretion to decide whether to address qualified immunity or the underlying claim of a constitutional deprivation first, considering the circumstances of the particular case. *Pearson v. Callahan,* 555 U.S. 223,

27

236 (2009). Defendants argue that they are entitled to qualified immunity for Plaintiff's § 1983 claims against them because Plaintiff has failed to sufficiently plead a constitutional claim against them.

Plaintiff asserts claims against Defendants for violation of his rights under the Fourteenth Amendment. FAC Counts I & II, ECF No. 17.[6] He pleads that Defendants failed to protect Chayce from harm and abuse in violation of the Fourteenth Amendment and that they took affirmative acts that created a danger of death. *Id.* The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As interpreted by the courts, the Due Process Clause protects substantive due process, which is the right to be free from government infringement against certain liberties such as personal security regardless of the process used, as well as procedural due process, which is the right to a fair procedure when the government deprives a person of protected liberties. *EJS Props., LLC v. Toledo,* 698 F.3d 845, 855 (6th

---

[6] In Count I of Plaintiff's FAC, he asserts a violation of constitutional rights under the Fourth and Fourteenth Amendments. FAC ¶ 80, ECF No. 17. The Fourth Amendment protects against unreasonable searches and seizures and requires probable cause for the issuance of warrants. *See* U.S. Const. amend. IV. Plaintiff's FAC alleges no facts that would plausibly suggest a violation of these rights by the State Defendants, and Plaintiff's counsel did not argue that Defendants violated Chayce's Fourth Amendment right at the hearing. Thus, Plaintiff does not state a claim for relief for violations of Chayce's Fourth Amendment rights against the State Defendants.

Cir.2012); *Kallstrom v. Columbus,* 136 F.3d 1055, 1062–63 (6th Cir.1998).

Plaintiff contends, in support of *both* of his § 1983 claims, that he has "adequately alleged a substantive due process violation under the state-created danger doctrine." ECF No. 36, PageID.198–200. Plaintiff alleges that a due process violation occurred when the State Defendants failed to follow state law to properly investigate the complaints of abuse by France against Chayce and that Chayce's death would have been avoided if the Defendants had fulfilled their duty to protect Chayce from abuse and neglect by France. *Id.* Plaintiff further argues in his Response that the State Defendants had a "special relationship" with Chayce that gave rise to an affirmative duty enforceable through the Due Process Clause. *Id.* PageID.190.

### a. Substantive due process claim

The Due Process Clause of the Fourteenth Amendment limits "the State's power to act," but "does not impose on the state an affirmative duty to protect individuals against private acts of violence." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 197 (1989). Nor does it impose an affirmative obligation on states to render aid. *Id.* at 195–96. Rather, the purpose of substantive due process is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196. Accordingly, under this general rule, the State Defendants did not have a constitutional obligation to protect Chayce

29

from private acts of violence by his mother. *See id.* at 197 ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.").

There are, however, two narrow exceptions to this general rule: (1) where the State enters into a "special relationship" with an individual by taking that person into its custody; and (2) where the State, by its "affirmative acts … either create[s] or increase[s] the risk that an individual will be exposed to private acts of violence"—the "state-created danger" exception. *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (citing *Kallstrom v. City of Columbus*, 136 F.3d at 1066); *see also Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019) ("[A] state-created danger theory provides a narrow path for recovery."). Plaintiff argues that he meets both exceptions.

### i.      Special relationship exception

Plaintiff argues in his Response that "Defendants had a special relationship with Chayce when they assumed custody of him." ECF No. 36, PageID.190. Plaintiff does not assert with any specificity when this happened. To the extent Plaintiff is  referring to when Simmons filed a petition for removal of France's children in December 2018, which was granted by the Wayne County Circuit Court, that claim fails. FAC ¶¶ 46–47, ECF No. 17. The children were removed from France's custody in December 2018 pursuant to that court order, and returned to her on November 17, 2020, again by court order, more than a year and a half

30

before Chayce's body was discovered on June 24, 2022. It is undisputed that Chayce was not in the State's custody at the time of his death. Plaintiff does not allege that Defendants Fields Davis, Fox, or Brott ever assumed custody of Chayce.

Defendants respond that the "special relationship" doctrine has been limited to "incarceration, institutionalization, or other similar restraint of personal liberty" and foster care. ECF No. 41, PageID.398 (citing *DeShaney*, 489 U.S. at 200). Defendants assert that in this case, it was the Wayne County Circuit Court that placed Chayce in the custody of the state in 2018, and later returned Chayce to his mother in December 2020, not the State Defendants. *Id.* Defendants contend that Plaintiff does not allege that Defendants Simmons, Fields Davis, Fox, or Brott took custody of Chayce, and thus they do not have a "special relationship" with Chayce for purposes of the substantive due process analysis.

The facts of this case are very similar to the "undeniably tragic" facts in *DeShaney*. In that case, the plaintiff, Joshua DeShaney, was a child in the custody of his father when the police learned that his father may have been abusing him. *DeShaney*, 489 U.S. at 191–92. The county department of social services interviewed the father, who denied the accusations, and the county did not pursue the matter any further. *Id.* at 192. Approximately a year later, Joshua was admitted to the hospital with multiple bruises and abrasions. *Id.* The county initially obtained a court order placing Joshua in the custody of the hospital, but later

31

decided there was insufficient evidence of abuse, and so released Joshua to his father. *Id.* The county did, however, enter into a voluntary agreement with the father that included several measures to help protect Joshua's safety. *Id.*

Unfortunately, this agreement did little to help. Over the next few months, Joshua returned to the emergency room with suspicious injuries, and during multiple home visits, the county caseworker noticed further injuries and other evidence of abuse. *Id.* at 192–93. But the county did nothing to intervene or remove Joshua from his father's home. *Id.* Ultimately, Joshua's father beat him so severely that he fell into a coma, and while doctors were able to save his life, his injuries caused such a high degree of brain damage that Joshua was expected to be institutionalized for the rest of his life. *Id.* at 193.

Through his mother, Joshua sued the county and various employees, alleging that they failed to intervene despite knowing that he was being abused. *Id.* But the Supreme Court held that, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. In an attempt to get around this general rule, Joshua argued that the state had a "special relationship" with him that arose because it knew of his risk of abuse and had expressed its intention to protect him from that danger. *Id.* The Court rejected this argument, holding that this

32

relationship alone was not enough to create a constitutional duty to act. *Id.* at 198–202.

The Court explained that the "special relationship" or "custody" exception only applies when the plaintiff is in the state's custody at the time he or she is injured. *See id.* at 201 ("'Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor."). As the *DeShaney* court explained, "[t]hat the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id*; *see also Engler*, 862 F.3d at 576 ("[U]nder *DeShaney*, even returning a child to an abusive home, without more, is insufficient to create a constitutional duty to protect.").

Similarly, here, the harms Chayce suffered occurred while he was in the custody of his mother, France, and not while he was in the custody of the State. There are no allegations that Chayce was harmed during the time he was in State custody from December 2018 to November 2020. Although the State had custody of Chayce at one time, it was not obligated under the Due Process Clause to thereafter permanently guarantee his safety. *DeShaney*, 489 U.S. at 201.

33

Accordingly, Plaintiff has not plausibly alleged that a special relationship existed between Chayce and the State Defendants sufficient to meet the "special relationship" exception to the rule that a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause.

### ii.    State-created danger exception

Plaintiff next argues that he has sufficiently stated a substantive due process claim under the state-created danger exception because he alleges that the State Defendants took affirmative acts that increased Chayce's risk of harm. ECF No. 36, PageID.191–92, 198–200. Plaintiff contends that Defendants "created the danger that took Chayce's life by removing Chayce and then repeatedly returning him to France despite escalating evidence of abuse." *Id.*

To establish liability under the state-created-danger theory, a "plaintiff must show: 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff." *Engler*, 862 F.3d at 575 (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). The Sixth Circuit has made clear that the state-created danger doctrine is a "demanding standard for

34

constitutional liability," *Jones v. Reynolds,* 438 F.3d 685, 691 (6th Cir. 2006), and has construed this exception very narrowly. *See Franz v. Oxford Cmty. Sch. Dist.*, 132 F.4th 447, 451 (6th Cir. 2025). "To establish a violation, the plaintiff must do more than show a causal connection between the state action and the private act of violence or negligence; [he] must identify an affirmative state action that is so egregious so as to be 'arbitrary in the constitutional sense' and 'shocks the conscience.'" *Langdon v. Skelding*, 524 F. App'x 172, 176 (6th Cir. 2013) (citing *Ewolski v. Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)).

In determining whether an affirmative state act increased the risk of harm to an individual, the question is whether the individual "was safer *before* the state action than … *after* it." *Cartwright*, 336 F.3d at 493 (emphases in original); *see also DeShaney*, 489 U.S. at 201 (state's temporary custody of a child before returning him to his dangerous father did not increase the child's risk of harm because the state "placed him in no worse position than  that in which he would have been had it not acted at all."). "When an official intervenes to protect a person, then later returns the person to 'a situation with a preexisting danger,' the intervention does not satisfy the affirmative act requirement for state-created danger." *Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461, 465 (6th Cir. 2013) (quoting *Bukowski v. City of Akron,* 326 F.3d 702, 709 (6th Cir.2003)).

For example, in *Langdon v. Skelding*, 524 F. App'x 172 (6th Cir. 2013), the Sixth Circuit found no state-created danger where, after CPS received multiple child abuse complaints but closed each investigation, a minor died in a house fire after being chained to a bed by her father and stepmother. *Id.* at 172–74, 175–77. The court rejected the plaintiff's argument that CPS's decision to close the investigations "in the face of such obvious dangers was an affirmative act that amounted to an endorsement of the parents' private acts thereby emboldening them." *Id.* at 176. The court noted that, "[t]he [parents] regularly chained [the minor] to the bed before the CPS investigation and continued doing so afterward," and determined that although the facts alleged showed that CPS did not sufficiently investigate the complaints of abuse, "this is a mere failure to act" insufficient to meet the state-created danger exception *Id.*

In this case, to the extent Plaintiff claims that the State Defendants' alleged failure to investigate or report allegations of abuse is the conduct at issue, he fails to state a claim under the state-created danger theory. "A state official's failure to investigate or report allegations of child abuse does not constitute an affirmative act" under the state-created danger exception. *Engler*, 862 F.3d at 576 (citing *Langdon*, 524 F. App'x at 176 (holding that "failing to remove a child from a foster home is not an affirmative act under the state-created danger

36

exception" even where the officials' investigation revealed "obvious dangers" to the child's safety)).

Plaintiff argues in his Response brief that the State Defendants are liable under the state-created danger exception because they affirmatively removed Chayce from his mother's custody, then returned him to her despite their knowledge of her abuse of him. ECF No. 36, PageID.192, 198–201. As discussed *supra*, the only time Plaintiff alleges in the FAC that Chayce was taken into custody by the State was when the Wayne County Circuit Court removed Chayce and his siblings from the family home in December 2018 after Defendant Simmons submitted a petition for his removal. FAC ¶¶ 46–47, ECF No. 17. The children were returned to France almost two years later, on November 17, 2020. *Id.* ¶ 48. However, Plaintiff does not plead that Simmons, Field Davis, Fox, or Brott, or specifically any State Defendants, were involved in the decision to return Chayce to France's custody in November 2020. He thus fails to meet his burden of pleading a constitutional violation by those Defendants.

At the hearing, Plaintiff's counsel argued that Defendants are liable under the state-created danger exception because, during the CPS investigation into the September 2021 allegation that France abused Chayce, Chayce was staying with his grandfather in Coldwater, where Plaintiff asserts he was safe, but then CPS instructed the grandfather to return Chayce to France's house, where he was eventually murdered.

However, a review of the CPS records provided by Plaintiff do not support that argument. On September 2, 2021, Chayce was staying with his grandfather in Coldwater. ECF No. 36, PageID.311. At that time "CPS asked both parties [Chayce's grandfather and his grandfather's long-term partner] if they plan on allowing Chayce to continue to stay with them for an extended amount of time to which they responded yes." *Id.* France also agreed to allow Chayce to stay in Coldwater with his grandfather while his physical abuse exam is being completed. *Id.* PageID.310. It was not until a September 15, 2021 home visit at France's home, and after a doctor found "no serious concerns" with regard to Chayce, that CPS "observed Chayce now that he had been returned home from his grandfather's home in Coldwater, MI." *Id.* PageID.314. However, nothing in the record states that CPS ordered or instructed the grandfather to return Chayce to France's home. Accordingly, the documents Plaintiff submitted with his Response fail to state a claim for a state-created danger.

In any event, accepting Plaintiff's allegations as true for purposes of Defendants' motion to dismiss, under *DeShaney*, returning a child to an abusive home, without more, is insufficient to create a constitutional duty to protect. *DeShaney*, 489 U.S. at 201. "The ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it." *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834,

38

854 (6th Cir. 2016). Therefore, to assert liability, Plaintiff must sufficiently allege that the State Defendants *increased* Chayce's susceptibility to violence and abuse. Plaintiff has not pled that the State Defendants' investigations and other acts placed Chayce in a worse position than if they had never acted at all. Rather, the same alleged harm to Chayce existed before and after the named Defendants had any involvement with the family.

In *Bukowski,* the Sixth Circuit Court of Appeals rejected a claim under the state-created danger doctrine where the police took temporary custody of a mentally disabled young woman and returned her to the dangerous situation from which they removed her. *Bukowski,* 326 F.3d at 708–09. In that case, the young woman had been lured far from her home to the home of a man twenty years older whom she met online. *Id.* at 705. When she arrived, the man repeatedly raped her. *Id.* The parents of the woman, who did not know that their daughter had left home, determined her location after searching her computer and contacted the local police, who picked the woman up and brought her back to the police station. *Id.* at 705–06. The officers who spoke with the woman recognized that she was "slow," but ultimately returned her to the man's house after she said he was her boyfriend and after she requested to be returned. *Id.* at 706. It was later determined that the woman had been repeatedly raped both before and after being picked up by the police. *Id.* at 706. In finding that the police could not be held liable for a constitutional

39

violation for their act of returning the woman back to the house, the Court reasoned that,

> Examining the quality of the governmental involvement here, it is apparent that the government was no more involved in making Bukowski more vulnerable to private violence than it was in *DeShaney*—in both cases, *the government was merely returning a person to a situation with a preexisting danger.* The plaintiffs' argument that the officials encouraged [the rapist] by their act of returning Bukowski is really the same as the argument that the officials encouraged [the rapist] by their refusal to get involved.

*Id.* at 709 (emphasis added).

Courts have reached similar conclusions in cases under similar facts as the facts here. In *Estate of Cottingham v. Hamilton County Department of Job and Family Services*, No. 1:16-cv-704, 2017 WL 398415 (S.D. Ohio Jan. 27, 2017), *report and recommendation adopted*, 2017 WL 680635 (S.D. Ohio Feb. 21, 2017), the plaintiff alleged that the defendants' act of returning a child to her mother's care, who then smothered the child a few weeks later, supported a claim of a state-created danger. *Id.* at *7. The court rejected that argument, finding that "[p]lacing [the child] in her mother's custody merely returned [her] to a position no worse than if the County defendants had never become involved at all" and "[t]hus, plaintiffs do not state a claim for relief for a substantive due process violation under a state-created danger theory." *See also Brenner v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, No. 1:04cv727, 2006 WL 2814913, at *10 (N.D. Ohio Sept. 28, 2006) (act

of reunifying young mother with infant daughter, who were both living with foster families, which resulted in death of infant, did not amount to state-created danger; child "was in no more danger after she was returned to her mother than she was when she was in her mother's custody at birth; if Defendants had not acted, she would have been in precisely the same amount of danger, if not more").

These cases compel the same result here.[7] The state court's returning Chayce and his siblings to France's care in November 2020 merely returned him to a position no worse than if the State Defendants (and particularly Simmons) had never become involved at all. And accordingly, Plaintiff fails to state a claim for relief for a substantive due process violation under a state-created danger theory.

Plaintiff therefore fails to state a claim that the State Defendants violated Chayce's constitutional substantive due process rights, and the State Defendants are entitled to qualified immunity in their individual

---

[7]     While the logic of these cases is compelling, and they are binding precedent, the Court must confess some discomfort with this rule that says a state actor is not liable for returning a citizen to a preexisting danger because they would be in no worse a situation than they were before the state intervened. If a state actor is actually aware that returning a citizen to a particular situation would expose that person to a significant danger of harm that did not exist while the person was in the state's care, a better rule would be to hold the state actor accountable for putting the person in danger. But that is not the situation before the Court, and that is not the state of the law.

capacities on Plaintiff's § 1983 claims in Counts I and II of the FAC. Accordingly, those claims will be **DISMISSED**.

### b. Procedural due process

It is not clear from the FAC whether Plaintiff is also asserting a procedural due process violation against the State Defendants. He does not explicitly address that claim in his Response brief and did not address this claim at the hearing. However, even if the Court were to read the complaint as asserting such a claim, it must fail as well.

"To establish a procedural due process claim, a plaintiff must show that (1) [he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (citations omitted). A state may create a due process protected liberty interest by "establishing substantive predicates to govern official decision-making and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Jasinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013) (citation modified). "The state statute 'must use explicitly mandatory language requiring a particular outcome if the articulated substantive predicates are present.'" *Id.*

In *Langdon*, the Sixth Circuit examined the issue of a caseworker's discretion under Michigan law in determining whether a right to procedural due process existed. The court found that although the statute

42

required a child services case worker to conduct an investigation, in certain circumstances, the statute did not mandate the investigation's outcome. Since the investigating caseworker had discretion concerning whether a child was abused or neglected, the statute did not create a right to procedural due process in the outcome of the investigation. *Langdon*, 524 F. App'x at 178 (whether the court itself could find sufficient evidence to prove abuse and/or neglect is immaterial; "what matters is that [the caseworker] had the discretion to find none").

Michigan's Child Protection Law ("CPL") mandates that within 24 hours after receiving a report, CPS must commence an investigation of a child suspected of being abused or neglected. M.C.L. § 722.628(1). However, the CPL does not mandate petitions for removal be filed in every case. Rather, the CPL requires a caseworker to file a petition if the caseworker makes a finding that a parent has abused the child with "[b]attering, torture, or other severe physical abuse." M.C.L. § 722.638(1)(a)(iii). That "decision necessarily involves 'a broad amount of discretion[.]'" *Langdon*, 524 F. App'x at 178. Plaintiff here does not allege that Defendants failed to commence an investigation for suspected abuse of Chayce or that Defendants made any finding of abuse after Chayce was returned to France in December 2020, and therefore the mandatory provision to submit a petition for removal was never triggered. Plaintiff's procedural due process claim therefore will be **DISMISSED**. *See Langdon*, 524 F. App'x at 178; *see also Estate of*

*Glenara Bates v. Hamilton Cnty. Dep't of Job & Family Servs.*, No. 1:15-cv-798, 2017 WL 106871, at \*5 (S.D. Ohio Jan. 11, 2017) (finding no procedural due process violation where "Plaintiffs do not identify any Ohio statute that mandated either that Glenara not be reunited with her both [sic] parents or that she be removed by the County Defendants upon an allegation of abuse.").

Accordingly, the Court finds that Plaintiff has failed to state a claim under § 1983 for deprivation of Chayce's Fourteenth Amendment right to due process.

## B.  State Law Claims (Counts III and IV)

Plaintiff also brings state-law tort claims for gross negligence (Count III) and wrongful death (Count IV). FAC ¶¶ 86–94 (Count III), 95–105 (Count IV), ECF No. 17. Defendants argue that Plaintiff's gross negligence and wrongful death claims are barred under Michigan's Government Tort Liability Act ("GTLA"), M.C.L. § 691.1407.

Under the GTLA, state employees acting within the scope of their authority and exercising a governmental function are entitled to immunity from tort liability as long as the employees' "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." M.C.L. § 691.1407. The Michigan Supreme Court has held that the phrase, "*the* proximate cause," in § 691.1407 does not mean "*a* proximate cause," as is usually the case in tort law, but rather "the one most immediate, efficient, and direct cause of the injury or damage."

44

*Robinson v. City of Detroit,* 613 N.W.2d 307, 319 (Mich. 2000) (emphasis added) (passengers in a stolen vehicle that crashed during a high-speed police chase could not sue police officers because their pursuit of the stolen vehicle was not "the proximate cause" of the injury).

The Sixth Circuit has specifically considered the issue of whether CPS employees could be liable for a gross negligence claim based on their involvement over nine years in allegations of abuse of a child, Nicholas, and his siblings by his father, Oliver, which ultimately ended with Nicholas's death. *See Jasinski,* 729 F.3d at 535–36. In *Jasinski,* CPS denied the majority of the complaints of abuse of Nicholas and opened one case for documentation purposes, and then closed it. *Id.* at 534–35. With respect to the plaintiff's gross negligence claim against the defendant CPS employees, the court found that *Robinson* clearly explains that the proximate-cause inquiry under the GTLA is different from proximate-cause analysis in other contexts because of the use of the definite article "the" in the GTLA. *Robinson,* 613 N.W.2d at 318. The defendant CPS employees argued that their conduct does not subject them to liability under the GTLA because Oliver was the most immediate, direct, and efficient cause of Nicholas's death, not their alleged lack of investigation. *Id.* at 544–45. The plaintiff responded that the defendants were the most immediate cause of Nicholas's death because "Defendants' investigation and substantiation of the complaint

45

of abuse was THE catalyst and THE cause of Nicholas' death." *Id.* at 545 (capitalization in original).

The Sixth Circuit found that the heightened "proximate cause" requirement articulated in *Robinson* foreclosed the plaintiff's gross negligence claim, stating "[w]ithout altogether ignoring Oliver's role in causing Nicholas's death, CPS employees' conduct cannot be said to be the 'most immediate, efficient, and direct cause' of the injury. Accordingly, [plaintiff's] state-law gross negligence claim must be dismissed." *Id.*

The same result is compelled here. Plaintiff's gross negligence and wrongful death claims against the State Defendants in their individual capacities are barred by governmental immunity and will be dismissed because, even if Plaintiff sufficiently pled that the State Defendants owed a legal duty to Chayce and that they were grossly negligent, Plaintiff expressly concedes that "it is indisputably true that France was the direct cause of Chayce's death." ECF No. 36, PageID.196. France therefore was the "most immediate, efficient, and direct cause" of Chayce's injuries, not the State Defendants, and Plaintiff's gross negligence and wrongful death claims will be **DISMISSED**. *See Jasinski*, 729 F.3d at 545; *see also Kerchen v. Univ. of Mich.*, 100 F.4th 751, 767 (6th Cir. 2024) (dismissing plaintiff's wrongful death claim against defendant, the pharmacology laboratory's director, as barred by governmental immunity because the decedent's overdose death was caused by a lab employee's removal of

46

fentanyl from the lab and supplied to the decedent, and not the lab director's purported failure to strictly enforce the lab's procedures); *Dougherty v. City of Detroit*, 986 N.W.2d 467, 479–80 (Mich. Ct. App. 2022) (defendant firefighter entitled to governmental immunity in wrongful death brought by mother whose son died in a house fire because the firefighter did not cause the son to be in the house during the fire or initiate the fire and thus was not the "but-for" cause of the son's death).[8]

## C. Plaintiff's Oral Request for Leave to Amend the FAC

At the hearing, Plaintiff's counsel requested leave to amend the complaint under Fed. R. Civ. P. 15(a) if the Court were going to grant Defendants' motion to dismiss. Plaintiff asked to add factual allegations in support of his state-created danger claim and to "limit" the number of named Defendants. Specifically, Plaintiff's counsel proposed amending the complaint to allege that CPS instructed or ordered Chayce's grandfather to return Chayce to France's home, thereby causing him to be removed from a safe environment and transferred to a dangerous one. The problem with Plaintiff's request is that the CPS file that Plaintiff attached to his response to the motion to dismiss, as discussed above, does not support this proposed amendment. Rather, it shows that CPS did not direct Chayce to be removed from his grandfather's home and

---

[8]    Because the Court finds that Defendants' Motion to Dismiss should be granted for all of these reasons, it will not address Defendants' additional argument that some of Plaintiff's claims are time-barred.

returned to France's home. Defendants opposed Plaintiff's request to amend, asserting that the CPS File has provided a sizeable record and Plaintiff has asserted no new facts at the hearing sufficient to state a claim under the state-created danger exception.

The Court will not approve Plaintiff's oral motion to amend the complaint at this time because it does not appear, based on the available record that Plaintiff provided, that a good faith claim could be made on the theory the Plaintiff suggests.

If Plaintiff wishes to file a motion for leave to amend his FAC, he may do so **within fourteen (14) days** from the date of this Order and must include *specific facts* supporting any allegation that the CPS is liable under the state-created danger exception. General allegations will not be sufficient, and Plaintiff will need to allege facts outside of the CPS record, which does not support that theory

## IV.   CONCLUSION

For the reasons stated above, the State Defendants' Motion to Dismiss Plaintiff's FAC, as written, will be **GRANTED** and Plaintiff's claims against Defendants Randall Fields Davis, Dominic Fox, Tresa Simmons, and Steven Brott will be **DISMISSED WITHOUT PREJUDICE.**

Plaintiff's claims against Defendants April Shakoor, Tracie Fields, Jasmine Gatling, LaShawnda McCoy, Larry Christ, Joshelle Shelby, and

Kejuana McCants will be **DISMISSED WITH PREJUDICE** because the FAC makes no specific allegations concerning their conduct.

If Plaintiff does not file any motion for leave to amend the FAC **within fourteen (14) days** of this Order, or if such motion is denied, the dismissal as to Randall Fields Davis, Dominic Fox,  Tresa Simmons, and Steven Brott will be **WITH PREJUDICE**.

This is not a final order and does not close the case.

**IT IS SO ORDERED.**

Dated: March 18, 2026          /s/Terrence G. Berg
                               HON. TERRENCE G. BERG
                               UNITED STATES DISTRICT JUDGE

49